IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DEVIN MICHAEL TEW,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER ADDRESSING PRE-TRIAL OBJECTIONS AND GRANTING DEFENDANT'S REMAINING MOTIONS IN LIMINE<br><br>Case No. 2:24-cr-00075-JNP<br><br>Chief District Judge Jill N. Parrish |

This memorandum decision and order addresses various pre-trial motions and objections upon which the court held oral argument at the final pretrial conference on April 21, 2026. Specifically, it addresses the following: (1) objections to proposed jury instructions that turn on the mens rea requirement for the charged offense; and (2) Defendant Devin Michael Tew's remaining motions in limine regarding specific proposed exhibits and lines of testimony. ECF No. 108 ("Def.'s Objs."); ECF No. 112 ("U.S.'s Objs."); ECF No. 109 ("Def.'s Third Mot. in Limine"); ECF No. 110 ("Def.'s Fourth Mot. in Limine").

## BACKGROUND

The pending trial is limited to the following charge of unlawful possession of drug manufacturing paraphernalia under 21 U.S.C. § 843(a)(6):

> Between at least 2018 and continuing until 2022 in the District of Utah, DEVIN MICHAEL TEW, the defendant herein, did knowingly and intentionally possess materials which may be used to manufacture a controlled substance, knowing, intending, or having reasonable cause to believe that the said materials would be used to manufacture a controlled substance in a manner other than

authorized by 21 U.S.C. §§ 801 through 901, all in violation of 21 U.S.C. § 843(a)(6).

ECF No. 1 ("Indictment") at 2. Although the indictment itself is barebones, the United States represents that its case centers on its allegations that Tew sold poppy seeds and bottles to customers for the purpose of making poppy seed tea with knowledge that this beverage—produced via instructions that he provided—would qualify as an illegal drug. *See, e.g.*, ECF No. 138 ("U.S.'s Tr. Br.") at 14–15.

## DISCUSSION

### I.    Jury Instructions

The parties jointly filed a document containing proposed jury instructions and stipulate to most of the proposed instructions contained therein. ECF No. 94 ("Jury Instructions"). However, both Tew and the government filed objections to specific instructions proposed by their counterpart. Def.'s Objs.; U.S.'s Objs. At this juncture, the court only addresses the objections to the extent that they turn on a legal dispute about the necessary mens rea for unlawful possession of drug manufacturing paraphernalia under § 843(a)(6).

The single charge proceeding to trial is under the following provision:

> It shall be unlawful for any person knowingly or intentionally— . . . to possess any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, *knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical in violation of this subchapter or subchapter II.*

21 U.S.C. § 843(a)(6) (emphasized). Based on this emphasized language, Tew argues that the United States must prove that he knew, intended, or had reason to believe that "material would be used to manufacture a controlled substance *in violation of the Drug Abuse Prevention and Control*

2

*Act (21 U.S.C. §§ 801–904)*" and his proposed instructions reflect this requirement. Def.'s Objs. at 2 (emphasis in original); Jury Instructions at 53. By contrast, the United States argues that it need only establish that Tew "kn[ew] and intend[ed] that . . . [the] material [would] be used to manufacture a controlled substance," regardless of whether Tew had any reason to believe that this manufacturing was illegal. U.S.'s Objs. at 3 (emphasis omitted). Its proposed jury instructions match this less stringent mens rea requirement. Jury Instructions at 52. Unsurprisingly, both parties object to their counterpart's proposal for misstating the applicable mens rea. Def.'s Objs. at 2; U.S.'s Objs. at 3–4; ECF No. 127 ("Def.'s Resp. to U.S.'s Objs.") at 2–4.

This appears to be a question of first impression and neither party presents controlling caselaw directly settling what mens rea § 843(a)(6) requires. In resolving this disagreement, the court is keenly aware that "[f]ew areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime." *United States v. Bailey*, 444 U.S. 394, 403 (1980).

As an initial matter, the court holds that the text of § 843(a)(6) is inconsistent with the government's position that it merely has to prove that Tew had reason to believe his products would be used to manufacture a controlled substance. As written, the provision requires the United States to prove that Tew knew, intended, or had reason to believe that his products would be used to "manufacture a controlled substance or listed chemical *in violation of this subchapter or subchapter II*." 21 U.S.C. § 843(a)(6) (emphasis added). The emphasized language refers to the Drug Abuse Prevention and Control Act, and the government's interpretation—where it only needs to prove that Tew knew his products would be used to manufacture a controlled substance, irrespective of whether he had any awareness that such manufacturing was illegal—impermissibly renders this phrase superfluous. *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("It is the cardinal

principle of statutory construction that is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section.") (citation modified); *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[O]ne of the most basic interpretive canons[] [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative[,] superfluous, void[,] or insignificant.") (citation modified); *McCloy v. U.S. Dep't of Agric.*, 351 F.3d 447, 451 (10th Cir. 2003) ("Under a long-standing canon of statutory interpretation, one should avoid construing a statute so as to render statutory language superfluous.").

The broader statutory context further confirms the conclusion that the phrase "in violation of this subchapter or subchapter II" has some independent legal significance and is not just a stylistic flourish, as the United States appears to suggest. Subsection 843(a) reads as follows:

> (a) Unlawful Acts
>
> It shall be unlawful for any person knowingly or intentionally—
>
> (1) who is a registrant to distribute a controlled substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order or an order form as required by section 828 of this title;
>
> (2) to use in the course of the manufacture, distribution, or dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is fictitious, revoked, suspended, expired, or issued to another person;
>
> (3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge;
>
> (4)(A) to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II, or (B) to present false or fraudulent identification where the person is receiving or purchasing a listed

chemical and the person is required to present identification under section 830(a) of this title;

(5) to make, distribute, or possess any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit substance;

(6) to possess any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical *in violation of this subchapter or subchapter II*;

(7) to manufacture, distribute, export, or import any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical *in violation of this subchapter or subchapter II* or, in the case of an exportation, *in violation of this subchapter or subchapter II* or of the laws of the country to which it is exported;

(8) to create a chemical mixture for the purpose of evading a requirement of section 830 of this title or to receive a chemical mixture created for that purpose; or

(9) to distribute, import, or export a list I chemical without the registration required by this subchapter or subchapter II.

21 U.S.C. § 843(a) (emphasis added). As this full context makes clear, § 843(a) references controlled substances in five different subsections, but only in two of those five does it contain the added language "in violation of this subchapter or subchapter II." *Id.* Based on the meaningful variation canon, the court concludes that this added language has some legal significance and rejects any suggestion otherwise. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) ("Where a document has used one term in one place, and a materially different term in another, the

presumption is that the different term denotes a different idea.") (citation modified) (quoting A. SCALIA & B. GARNER, READING LAW 170 (2012)).

On the other hand, the government's position does receive some support from the maxim—which the government cites—that "ignorance of the law is no excuse," which "typically holds true." *Elonis v. United States*, 575 U.S. 723, 734–35 (2015) (citation modified); U.S.'s Objs. at 5. But the Supreme Court has clarified that this maxim does not apply to "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan v. United States*, 524 U.S. 184, 194 (1998). There is precisely this danger here where a chemist who merely provides a three-neck round-bottom flask to her laboratory with the reasonable but mistaken belief that its procedures comply with complex regulations governing labeling and record-keeping risks falling within the ambit of § 843(a)(6).[1] *See, e.g.*, §§ 21 U.S.C. 825, 827 (directly imposing various requirements and requiring compliance with further regulations issued by the Attorney General). The court cannot fathom that Congress ever intended § 843(a)(6) to reach so broadly and will not impose that result when the statutory language is amenable to a more natural, alternative interpretation. And, in any event, the court doubts that this maxim—even if

---

[1] This explains why the Supreme Court's discussion in *McFadden v. United States*, 576 U.S. 186 (2015) is inapt. In the context of a different statute, 21 U.S.C. § 841(a)(1), the Supreme Court noted that a defendant could have sufficient knowledge that he possessed a controlled substance if he knew the identity of the substance and the substance was in fact controlled, even if the controlled status was unbeknownst to him. *McFadden*, 576 U.S. at 192. In reaching this conclusion, the Court relied on the maxim that "ignorance of the law is typically no defense to criminal prosecution." *Id.* But that maxim, even if applicable to § 841(a)(1), is not applicable to § 843(a)(6) because the latter provision implicates much more innocent conduct and more complex regulatory questions. In any event, Chief Justice John Roberts plausibly argues that this discussion in *McFadden* is both dicta and unpersuasive even with respect § 841(a)(1) itself. *Id.* at 198–99 (Roberts, C.J., concurring). *But see United States v. Shamo*, 36 F.4th 1067, 1076 (10th Cir. 2022) (positively citing this discussion in *McFadden*).

applicable—is sufficient to overcome core tenants of statutory interpretation and the plain language of the statute, which lead the court to conclude that the phrase "this subchapter or subchapter II" must have some legal significance.

The court must also bear in mind the fundamental principle that the scope of mens rea requirements is responsive to the necessity of "separat[ing] wrongful from innocent acts." *See Ruan v. United States*, 597 U.S. 450, 458 (2022) (quoting *Rehaif v. United States*, 588 U.S. 225, 232 (2019)). When the actus reus requirements of § 843(a)(6) are so minimal—and, for example, are satisfied by chemistry teachers nationwide simply by "possess[ing] any three-neck round-bottom flask"—and a violation authorizes a sentence of four years in prison, there is reason to conclude that Congress intended to impose a relatively strict mens rea requirement. 21 U.S.C. § 843(a)(6), (d); *Ruan*, 597 U.S. at 460 ("[S]evere penalties counsel in favor of a strong scienter requirement."). Thus, the plain language suggests that Congress intended § 843(a)(6) to require some awareness of illegality to prevent it from sweeping in too much innocent conduct. And to the extent that there remains ambiguity even after applying traditional principles of statutory interpretation, the statute must be construed in favor of criminal defendants under the rule of lenity. *United States v. Tony*, 121 F.4th 56, 69 (10th Cir. 2024).

In summary, based on statutory text and the background principle that mens rea requirements "establish the defendant's culpable state of mind," the court concludes that § 843(a)(6) requires the government to prove that Tew knew, intended, or had reasonable cause to believe that the use of his products by his customers to manufacture controlled substances would be illegal under the Drug Abuse Prevention and Control Act. *Elonis*, 575 U.S. at 736. This mens rea is negated if Tew reasonably believed that the use of his products by his customers was in fact lawful.

At times, Tew misstates the mens rea requirement, both in his briefing and his proposed jury instructions, when he suggests that the relevant inquiry is whether he had reason to believe that *his own* activities were unlawful. *See* Def.'s Obs. at 3; Jury Instructions at 55. Instead, the ultimate inquiry—given the statutory language—is whether Tew had reason to believe that that his products were going to be used to unlawfully manufacture controlled substances.[2] Of course, Tew's knowledge of his business's legality likely bears on whether he knew that the downstream uses of his products would be legal. But the two questions are logically distinct, and only the second is directly implicated by § 843(a)(6).

The court thus SUSTAINS the objections of both parties to the extent that they follow from this interpretation of § 843(a)(6)'s mens rea requirement and OVERRULES the objections to the extent that they are inconsistent with this interpretation. The court will file proposed jury instructions that reflect this understanding of the charged offense.

## II.     Motion in Limine

Tew moves in limine to exclude three categories of evidence: (1) evidence of cash found in his residence; (2) evidence that he failed to file Utah taxes; and (3) pictures of poppy seeds found in his residence. The court considers these in turn.

---

[2] This is because the adverbial modifier "in violation of this subchapter or subchapter II" attaches to the phrase it directly follows, "used to manufacture a controlled substance or listed chemical." *See United States v. Cunningham*, 630 F. App'x 873, 878 n.6 (10th Cir. 2015) ("The general rule is that a modifier, like an adverb, is placed next to the word it modifies."). By contrast, Tew's alternative interpretation—where what matters is whether he had scienter that his conduct was in violation of the law—would implausibly have the adverbial modifier attach to the very beginning of § 843(a)(6), which defines the relevant actus reus.

A.    Cash

In his third motion in limine, Tew moves "to exclude any testimony or exhibits regarding monies found at . . . Tew's residence" under Rules 402, 404(b), and 403. Def.'s Third Mot. in Limine at 1. Specifically, Tew requests the exclusion of documents marked as the government's exhibits 33 through 37 and 41 through 44, which "involve pictures of cash, pictures of cash in Chase bank envelopes, and pictures of cash located in items of clothing." *Id.* at 2. *See* ECF No. 109-1 ("U.S.'s Tr. Exs. 33–37"); ECF No. 109-2 ("U.S.'s Tr. Exs. at 41–44"). The court grants this request and excludes both the proposed exhibits and any testimony about the cash found at Tew's residence under Rule 403.

As an initial matter, the court notes that it is unclear whether the evidence is even relevant. The government argues that "the evidence regarding the [paper money] found in . . . Tew's clothing" is relevant because it "tends to make it more or less probable" that "Tew knew or had reasonable cause to believe he was selling illegal drug paraphernalia." ECF No. 123 ("U.S.'s Opp'n to Def.'s Third Mot. in Limine") at 2–3. As the government appears to concede in its briefing, this probative value depends on the paper money being linked to Tew's poppy seed business. If, by contrast, the stored money came from other ventures, then its existence conveys scant, if any, information regarding Tew's understanding of the poppy seed business. *See* ECF No. 109-4 ("Def.'s Ex. 4") (indicating some of the stored money came from "sperm stuff"). It is unclear whether the government is able to provide sufficient proof to establish this nexus between the cash and Tew's poppy seed business, in which case the evidence may demand exclusion under Rule 402. *See* FED. R. EVID. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.").

The government represents that it can link the paper money found at Tew's residence to his poppy seed business based on an interview with Tew, but the attached transcript that it relies on in fact shows otherwise. *Id.* at 2; ECF No. 123-1 ("U.S's Ex. 1"). In the transcript, Tews indicates that the money from his poppy seed business ended up in a "Bank of [A]merica" account and paying for a "prepaid" American Express credit card and agreed that he "got a lot of cash out of the account at Bank of America." Def.'s Tr. Ex. 112 at 113–15. While further portions of the conversation may suggest that some of the cash found at Tew's residence came from his Bank of America account, nothing directly links the cash found at his residence to his poppy seed business. *Id.* at 116. Indeed, the very transcript that the government relies on indicates that Tew used the revenue from his poppy seed business to "reinvest it back in the company" and purchase additional poppy seeds, which suggests that the bulk of the money came from other sources. *Id.* at 115.

In any event, even if there were evidence linking the cash to Tew's poppy seed business, its existence would still have a low probative value because it is amenable to a variety of different explanations that have nothing to do with the charged offense: Tew may have stored paper money because it was the preferred method of payment by his supplier[3]; he may have been following the role model of his parents who stored $60,000 in a safe[4]; he may have been worried about the illegality of some other venture or his failure to pay taxes, which is discussed below; he may have had the common, even if mistaken, belief that money is safest when stored at home.[5] The mere

---

[3] This explanation is particularly plausible because Tew indicated that he "would typically just reinvest [money] back in the company." U.S. Ex. 1 at 115.

[4] *See* Def.'s Third Mot. in Limine at 4–5.

[5] According to one survey, 24% of Americans think the safest place to store their money is in their home. Jacob Wade, *Americans Think Stashing Their Money at Home Is Safer Than Most Bank Accounts, Survey Finds*, GOBANKING RATES (Aug. 18, 2023),

fact that Tew stored cash thus does little to establish that Tew knew his poppy seed tea was illegal. While the evidence may still clear Rule 401's low bar for relevance, it does little to meaningfully advance the government's case.

On the other side of the ledger, several concerns substantially outweigh this minimal probative value under Rule 403. Most concerningly, the proposed evidence of money may be used to support an impermissible propensity inference that Tew committed the charged offense simply because he is the kind of person who stores paper money in a suspicious manner. *See* FED. R. EVID. 404(a)(1); *United States v. Gomez*, 763 F.3d 845, 857 (7th Cir. 2014) (noting that Rule 403 excludes evidence "that may be slightly probative through a non-propensity theory but has a high likelihood of creating unfair prejudice by leading a jury to draw conclusions based on propensity"); U.S.'s Opp'n to Def.'s Third Mot. in Limine at 4 ("The fact that . . . Tew had $180,000 in cash stowed away . . . make[s] him *look like* a drug dealer.") (emphasis added). And, similarly, the evidence, especially through the proposed photographic exhibits, may "provoke[] an emotional response in the jury or otherwise . . . affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocen[c]e of the crime charged." *United States v. Burgess*, 576 F.3d 1078, 1099 (10th Cir. 2009). Apart from undue prejudice, this evidence opens the door to a mini trial on how Tew stored money from various ventures across various accounts, which would be a waste of scarce trial time and needlessly burden the jury with complicated financial issues that have virtually nothing to do with the charged offense.

---

https://www.gobankingrates.com/banking/banking-advice/americans-think-stashing-their-money-at-home-is-safer-than-most-bank-accounts-survey-finds/?hyperlink_type=manual&link_placement=first-link&link_position=1 [https://perma.cc/9S9C-CBU7].

Accordingly, the court GRANTS Tew's third motion in limine with respect to the cash found at Tew's residence under Rule 403.[6] The court orders that the government may neither introduce its proposed exhibits depicting the paper money found at Tew's residence nor solicit testimony regarding its existence. The government remains able to solicit testimony about the quantity of money Tew generated from his poppy seed business, which is outside the scope of Tew's motion in limine and the court's order.

B.      Taxes

In his third motion in limine, Tew also moves to exclude "any testimony or exhibits discussing . . . Tew's failure to file Utah state income tax from 2018-2020" under Rules 402, 404(b), and 403. Def.'s Third Mot. in Limine at 1. Here, Tew specifically moves to exclude a document marked as the government's exhibit 46, which "appears to be a letter from the Utah State Tax Commission to the Grand Jury [indicating] that no Utah State Income Tax returns could be located for . . . Tew during the periods between January 1, 2018, through March 1, 2020." *Id.* at 2; ECF No. 109-3 ("U.S.'s Ex. 46"). This evidence even more clearly requires exclusion.

Again, it is unclear whether this evidence is even relevant under Rule 401. The government suggests that Tew failed to pay state taxes because he "had reasonable cause to believe he was selling illegal drug paraphernalia." U.S.'s Opp'n to Def.'s Third Mot. in Limine at 2–3. But it appears much more likely that Tew's failure to pay taxes is explained by a host of alternative hypotheses—such as the all too likely possibility that Tew simply did not want to hand over money

---

[6] Since the final pre-trial conference, the government has filed supplemental briefing without seeking leave from the court. ECF No. 149 ("U.S.'s Suppl. Br."). In any event, it does not change the court's analysis.

to the State of Utah. Here, it is especially conspicuous that the government only offers two years of tax records and does not attempt to link Tew's failure to file to start of his poppy seed business.

Irrespective of the Rule 401 analysis, this scant probative value is substantially outweighed by the risk of undue prejudice that the jury will draw an impermissible propensity inference. The prohibition on character evidence, codified in Rule 404(a)(1), is "of fundamental importance for the protection of the innocent" and reflects the fundamental tenant that "a defendant starts his life afresh when he stands before a jury." *People v. Zackowitz*, 254 N.Y. 192, 197 (1930). There is no reason to brush aside these fundamental principles and open the door to an impermissible character inference—where the jury may convict Tew based on other illegal conduct, not charged in the indictment—when the proposed evidence has almost no bearing on the charged offense.

Therefore, the court GRANTS Tew's third motion in limine with respect to Tew's failure to pay Utah taxes under Rule 403. The court orders that the government may neither introduce its proposed exhibit nor solicit testimony regarding Tew's failure to file taxes.

C.    Pictures of Poppy Seeds

Finally, Tew moves in limine to exclude two exhibits—marked as the government's exhibits 57 and 58—under Rules 402 and 403. Def.'s Fourth Mot. in Limine. These exhibits are photographs of covered boxes with poppy seeds inside and a cup, containing what appears to be wet poppy seeds, respectively. ECF No. 110-1 ("U.S.'s Tr. Ex. 57); ECF No. 110-2 ("U.S.'s Tr. Ex. 58"). The government opposes this motion. ECF No. 133 ("U.S.'s Opp'n to Def.'s Fourth Mot. in Limine").

Tew argues that these proposed exhibits are irrelevant under Rule 401 because they merely depict poppy seeds, which are legally sold and not listed as a controlled substance, and thus have nothing to do with the charged offense. Def.'s Fourth Mot. in Limine at 3–4. In its briefing and

oral argument, the government argued that these pictures are relevant because the manner in which Tew stored poppy seeds and the sheer quantity of poppy seeds is probative of whether Tew believed his business was lawful. The court is skeptical of this theory of relevance. The mere fact that Tew stored poppy seeds in plastic bags in a storage unit, which the proposed exhibits depict, conveys scant information about whether Tew had a culpable mental state. And the quantity of poppy seeds may even cut against the government's case and suggest that Tew believed his business was legal—which may be why Tew was so committed to the enterprise and invested so much in inventory. This evidence is simply not "strong circumstantial evidence that [Tew] knew he was selling illegal drug paraphernalia online and that his customers would use his products to manufacture (or prepare) an illegal opioid tea at home," no matter how many times the government baldly asserts otherwise. U.S.'s Opp'n to Def.'s Fourth Mot. in Limine at 5. And the probative value of these exhibits is further reduced because the government likely will be able to solicit testimony regarding the poppy seeds found in Tew's storage unit, which Tew does not move to exclude. *See* U.S.'s Tr. Br. at 17–18.

Regardless of relevance, the court finds that these proposed exhibits lack sufficient probative value to pass muster under Rule 403. Importantly, these exhibits are largely cumulative because Tew's counsel has already "stipulated to the admission of a number of photographs of the PoppySeedWash bottles[] and other poppyseed containers" at trial, many of which visibly contain poppy seeds. Def.'s Fourth Mot. in Limine at 4–5. *See* ECF No. 110-3 ("U.S.'s Tr. Ex. 13"); ECF No. 110-4 ("U.S.'s Tr. Ex. 14"); ECF No. 110-5 ("U.S.'s Tr. Ex. 15"); ECF No. 110-6 ("U.S.'s Tr. Ex. 21"); ECF No. 110-7 ("U.S.'s Tr. Ex. 22"); ECF No. 110-8 ("U.S.'s Tr. Ex. 23"); ECF No. 110-9 ("U.S.'s Tr. Ex. 30"); ECF No. 110-10 ("U.S.'s Tr. Ex. 38"); ECF No. 110-11 ("U.S.'s Tr. Ex. 39"). And, as Tew notes, these photographs may needlessly confuse the jury because the assembled

14

kits, not poppy seeds themselves, are the basis of the charged offense. Def.'s Fourth Mot. in Limine at 5–6. The court is also concerned that these photographs may be used to make an impermissible propensity inference—which the government's counsel appeared to invoke at oral argument—that it is more likely that Tew unlawfully possessed drug paraphernalia simply because he stored poppy seeds in unsanitary conditions and in large quantities. Whether Tew stored poppy seeds hygienically and how many poppy seeds he stored is simply beside the point and should not influence the jury.

In light of these concerns regarding the government's proposed exhibits 57 and 58 and their minimal probative value, the court GRANTS Tew's motion in limine and excludes these proposed exhibits under Rule 403.

## CONCLUSION AND ORDER

In summary, the court rules as follows: the parties' objections to jury instructions are SUSTAINED to the extent that they follow from the court's interpretation of § 843(a)(6)'s mens rea requirement above and are OVERRULED to the extent that they are inconsistent; and Tew's third and fourth motions in limine are GRANTED.

DATED April 23, 2026

BY THE COURT

Jill N. Parrish
United States District Court Judge

15